UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
AROR-ARK ARK O'DIAH,

                Plaintiff,

- against -

NEW YORK CITY DEPARTMENT OF
HOUSING; RENAISSANCE EQUITY
HOLDINGS LLC, Owner; ISABELLA JOH,
Property Controller; WORLD TRADE
CENTER HEALTH PROGRAM and CDC-
NATIONAL INSTITUTE OF
OCCUPATIONAL SAFETY AND HEALTH
and DIRECTOR; NYC HEALTH +
HOSPITALS/McKINNEY; JAMAICA
HOSPITAL MEDICAL CENTER; DR.
GLENN J. JAKOBSEN; FLATBUSH
GARDENS; DR. ZANE HOFFMAN;
CAPITAL ONE BANK, N.A.; NEW YORK
STATE COMMISSIONER OF THE
DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION; LOGISTICS
HEALTH INCORPORATED; WILLIAM
STREET CLINIC; SEPTEMBER 11, 2001
VICTIM COMPENSATION FUND and
SPECIAL MASTER; JPMORGAN CHASE
BANK, N.A.; NYU LANGONE HEALTH
PULMONARY AND SLEEP MED-BKLN
and BORIS SAGALOVICH, MD;
FLATBUSH GARDENS MANAGEMENT;
and FLATBUSH GARDENS SECURITY and
OWNER;

                Defendants.
------------------------------------------------------------x

**MEMORANDUM & ORDER**
21-MC-577 (PKC)

PAMELA K. CHEN, United States District Judge:

By order entered January 11, 2012, the Honorable Sandra J. Feuerstein enjoined Plaintiff Aror-Ark Ark O'Diah ("Plaintiff") from filing any new civil action or proceeding in this Court without first obtaining leave of the Court. *O'Diah v. Port Auth. of N.Y. & N.J.*, No. 05-CV-5297

(SJF) (LB), 2012 WL 113551, at *2 (E.D.N.Y. Jan. 11, 2012). The order required that within 20 days of filing any new complaint, petition, or pleading in this Court, Plaintiff must file a motion for leave to commence the new action, setting forth the good faith basis for the filing of the action. *Id.* Plaintiff was informed that failure to comply would result in dismissal of the action with prejudice and without further notice to Plaintiff. *Id.* Among other requirements, Plaintiff must also append a copy of the January 11, 2012 Injunction Order to every new litigation in any federal court. *Id.* at *3.

On February 3, 2021, Plaintiff submitted a new proposed complaint. However, Plaintiff failed to comply with the requirements of the January 11, 2012 Injunction Order by not including a copy of the Injunction Order, and more substantively, not setting forth a good faith basis for the filing of the action against each of the multiple named defendants. Accordingly, leave to file is hereby denied.

## BACKGROUND

### I. The Filing Injunction

Plaintiff has previously filed multiple civil actions in this Court or that were transferred to this Court. *See O'Diah v. U.S. Filter*, No. 99-CV-8010 (JS) (MLO), Slip op. (E.D.N.Y. May 17, 2001) (dismissing claims with prejudice pursuant to Federal Rules of Civil Procedure 41(b) and 16(f)); *O'Diah v. Nassau County*, No. 00-CV-6519 (SJF) (MLO), Judgment (E.D.N.Y. Mar. 21, 2005) (final judgment dismissing the case after all defendants had previously been dismissed); *O'Diah v. Botto Mech. Corp.*, No. 04-CV-224 (SJF) (MLO), Order (E.D.N.Y. Jan. 7, 2005) (dismissing claims for failure to state a claim); *O'Diah v. Sears Roebuck & Co.*, No. 04-CV-3828 (SJF) (MLO), Slip Op. (E.D.N.Y. Oct. 14, 2004) (dismissing claims with prejudice pursuant to Federal Rule of Civil Procedure 41(b) and discussing Plaintiff's lengthy history of litigation and filing injunction issued in the Southern District of New York); *O'Diah v. Port Auth. of N.Y. &*

*N.J.*, No. 05-CV-5297 (SJF) (LB), 2008 WL 11417249 (E.D.N.Y. July 2, 2008) (recommending dismissal of plaintiff's claims related to his interactions with Port Authority Police Officers and subsequent prosecution and incarceration, among other claims, and also encompassing claims filed in Nos. 06-CV-3602, 06-CV-4040, 07-CV-1169, 07-CV-4731, and 08-CV-1646), *report and recommendation adopted*, 2008 WL 11417248 (E.D.N.Y. Sept. 18, 2008); *O'Diah v. Corcoran*, No. 09-CV-3580 (SJF) and *O'Diah v. Cuomo*, No. 11-CV-1793 (SJF), 2013 WL 1339413 (E.D.N.Y. Mar. 29, 2013) (dismissing petitions for *habeas corpus* challenging Plaintiff's 2007 conviction); *O'Diah v. Hereford Ins. Co.*, No. 10-CV-944 (DLI) (VVP), 2011 WL 976415 (E.D.N.Y. Mar. 16, 2011) (dismissing claims related to an automobile accident), 2012 WL 195003 (E.D.N.Y. Jan. 23, 2012) (denying motion to vacate the judgment).

On January 11, 2012, Judge Feuerstein enjoined Plaintiff from filing any new civil action or proceeding in this Court without first obtaining leave of the Court. *O'Diah v. Port Auth. of N.Y. & N.J.*, 2012 WL 113551, at *2. Despite the injunction, Plaintiff has continued to file cases. *See O'Diah v. U.S. Dep't of Health & Hum. Servs.*, No. 16-CV-1373 (PKC), 2016 WL 10567949 (E.D.N.Y. June 6, 2016) (dismissing claims related to public benefits and Plaintiff's 2007 conviction); *O'Diah v. Discover Bank*, No. 19-CV-2730 (PKC) (LB), 2019 WL 2289406 (E.D.N.Y. May 29, 2019) (directing Plaintiff to file a motion for leave to file in order to proceed), Docket Order (E.D.N.Y. June 18, 2019) (dismissing the complaint).

## II. The Instant Complaint

The allegations in the instant proposed complaint are rambling and somewhat confusing. The Complaint names almost twenty defendants, contains 58 paragraphs in its statement of facts, and seeks $1.4 billion in relief under claims for harassment, discrimination, breach of fiduciary duty, civil rights violations, extortion, medical malpractice, and wrongful death. (Complaint

3

("Compl."), Dkt. 1, at ECF[1] 2–3, 16–19; *id.* ¶¶ 1–58.) Broadly, Plaintiff alleges that he and his spouse, Yonette Antoinette Grant ("Grant"), were victims of the September 11, 2001 terrorist attack at the World Trade Center and have suffered health problems and discrimination as part of a wide-ranging conspiracy in the years following. The Court summarizes Plaintiff's factual allegations as follows.

### A.   September 11 Aftermath and Medical Treatment Issues

Plaintiff alleges that he and Grant suffered multiple physical and psychological injuries as a result of the September 11, 2001 terrorist attack and while "searching for [the] missing [c]lients [of their tour business] in the period of September 11, 2001 through June 22, 2006." (Compl., Dkt. 1, ¶¶ 2–4.) On September 11, 2001 and thereafter, Plaintiff and Grant visited multiple medical facilities for treatment. (*Id.* ¶ 4.) "But whenever Plaintiff appear[ed] at each of the Hospital[s], Plaintiff was labelled as a Terrorist" and the facilities refused to treat him. (*Id.* ¶¶ 4, 26.) As a result, Plaintiff and Grant "were afraid to go to Hospitals, Clinics and Healthcare facilities" between September 11, 2001 and December 12, 2012, and, thus, their "physical bodily injuries and mental harms were not timely diagnosed." (*Id.* ¶ 27.)

Plaintiff was diagnosed with prostate cancer on December 12, 2012 while incarcerated by the New York State Department of Corrections and Community Supervision. (*Id.* ¶ 28.) He asserts that multiple medical facilities refused to treat him, falsified his test results, and failed to disclose his medical records on the basis of his national origin. (*Id.* ¶¶ 39, 57.)

Grant sought treatment for menstrual and bowel problems from a New York City Health + Hospitals ("NYCHH") provider on June 6, 2009, where she was offered laxatives but was refused her request for colon screening. (*Id.* ¶ 30.) Grant went to a NYCHH facility on June 6, 2017 and

---

[1] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

was diagnosed with fourth stage cancer in multiple organs. (*Id.* ¶ 31.) She was treated with experimental cancer medication that made her lose her appetite. (*Id.* ¶ 32.) NYCHH indicated it would change the medication but did not; in December 2019, Plaintiff and Grant discovered that she was being given the wrong medication. (*Id.* ¶¶ 32–33.) Grant was admitted to a NYCHH facility from December 19 to 26, 2019, but was told not to return "because Plaintiff and Plaintiff's late Spouse had told the Defendant [NYCHH] of their intent to file [a] medical malpractice complaint." (*Id.* ¶¶ 35–38.) Grant died on February 25, 2020 "as [a] result of multiple physical bodily injuries [including multiple cancers] . . . due to September 11, 2001." (*Id.* ¶ 10.)

In January and February 2020, before Grant passed away, Plaintiff and Grant submitted enrollment applications to the World Trade Center Health Program and the September 11 Victim Compensation Fund. (*Id.* ¶¶ 6–9.) Plaintiff alleged that Grant's application was processed, but that the Fund did not acknowledge receipt of his application and refused to process the application because of his national origin and because it claimed he was a terrorist. (*Id.* ¶ 8.) Plaintiff resubmitted his application and authorized release of his medical records, but no records were released. (*Id.* ¶¶ 9, 11–12.) He attaches a letter from one provider that stated that the provider did not keep medical records for more than seven years. (*Id.* at ECF 42.) However, Plaintiff claims that the facilities "destroyed Plaintiff's medical records via retaliatory and discriminatory practices upon their identification of Plaintiff's national origin," and "in retaliation because Plaintiff had filed [a] complaint against corrupted wicked racist federal and states [sic] judges who hired hard core criminals as their own hit men and hit women planted inside many private[] and public establishments in disguise." (*Id.* ¶¶ 13, 16; *see also id.* ¶ 19.) Plaintiff was told that he did not qualify for certification of certain medical conditions because he was not a police officer or firefighter. (*Id.* ¶ 20.) He alleges that this policy is unconstitutional. (*Id.*) The documents attached

5

to the Complaint show that Plaintiff's claim to the September 11 Victim Compensation Fund on Grant's behalf was placed on "inactive" status, because the Fund could not verify that Plaintiff had been appointed as Grant's Personal Representative. (*Id.* at ECF 26.)

### B. Housing Issues

Plaintiff further alleges that in November 2019, he and Grant both requested information from the New York City Department of Housing Preservation and Development ("HPD") about housing subsidies under the Section 8 program, and that his request was not acknowledged, though Grant's was. (*Id.* ¶ 41.) They subsequently went to the HPD Office and requested information; Grant was given the information she requested, along with an application, but Plaintiff was told that Section 8 was no longer accepting applications.[2] (*Id.* ¶ 42.) Grant attempted to add Plaintiff's name to her lease, but was told that she could not do so unless Plaintiff had a disability and a low income. (*Id.* ¶ 43.) Though Plaintiff has a disability and a low income, his application to join Grant on the lease was denied. (*Id.*) Grant used her Section 8 voucher for an apartment at 3403 Foster Avenue in Brooklyn. (*Id.* ¶ 44; ECF 23.) The HPD notified Grant that her housing subsidy was based on her household income and family composition as a single individual. (*See id.* at ECF 23.) The annual registration document issued by the State of New York Division of Housing and Community Renewal showed that, as of April 1, 2020, Grant was the sole legal tenant in occupancy, received Section 8 benefits, and was expected to pay $285.08 per month. (*Id.* at ECF 24.) Nonetheless, Plaintiff states that he resided in the apartment and paid Grant's rent.[3] (*Id.* ¶ 44.)

---

[2] While the allegations in the complaint indicate that Grant and Plaintiff requested the same information and that Plaintiff was turned down (*see* Compl., Dkt. 1, ¶ 42), the Court notes that it appears from the documents attached to the Complaint that Grant was already in possession of HPD assistance in 2019, and that at that time she was renewing her lease, rather than seeking new housing (*see id.* at ECF 24 (checking box for "Lease Renewal" on HPD form)).

[3] The Court assumes that based on Plaintiff's allegation that Grant died in February 2020, Plaintiff has been living at the 3403 Foster Avenue apartment without her.

6

Although Grant was the legal tenant and received Section 8 subsidies, Plaintiff claims that the property manager "extorted" rent payments from him between January 2016 and December 2020 and owes him $28,472 in "over-charges." (*Id.* ¶ 21.)

After Grant died on February 25, 2020, Plaintiff asked the management company to be added to the lease and to remain in residence. (*Id.* ¶¶ 46–47.) HPD continued making subsidy payments on Grant's behalf after her death and eventually demanded repayment of Section 8 subsidies given from March to May 2020. (*Id.* ¶¶ 50–54; ECF 47–48.) The property management company told Plaintiff that no lease would be issued in his name unless he paid Grant's back rent and repaid the HPD subsidies. (*Id.* ¶¶ 48, 50; ECF 47–48.) Plaintiff continued to occupy the apartment and made payments toward the rent. (*Id.* ¶¶ 50, 53; ECF at 52–54, 57.) Beginning on June 16, 2020, the landlord sent security guards to "evict Plaintiff from the apartment on false charges that Plaintiff illegally occupied the Apartment, and that Plaintiff owe[d] rent . . . upon the identification of Plaintiff's national origin-Nigeria." (*Id.* ¶ 58.) Plaintiff was served with a 30-day Notice to Quit on January 12, 2021. (*Id.* at ECF 21–22.) The notice stated that his occupancy was illegal, because any permission Grant had given him to occupy the apartment expired on her death on February 25, 2020. (*Id.*)

Plaintiff asserts that the apartment had no heat or clean water in December 19, 2019, which worsened Grant's medical issues and contributed to her death. (*Id.* ¶¶ 34, 45.)

    C.    **Miscellaneous Additional Allegations**

Plaintiff alleges that other Defendants discriminated against him on the basis of his national origin. He states that he was denied payments from Xincon Home-Healthcare Services Inc. and Nationwide Insurance Company following Grant's death because of his national origin and "with the hope that [s]omebody might murder [] Plaintiff." (*Id.* ¶ 22.) He attaches a statement showing that the remaining funds were withdrawn from Grant's retirement account with Xincon Home-

Healthcare Services Profit Sharing Plan after her death between October 1, 2020 and December 31, 2020. (*Id.* at ECF 45.) Plaintiff states that Grant authorized him to close her accounts at Capital One Bank, but that the bank refused to give him access to her accounts "upon the identification of Plaintiff's national origin-Nigeria." (*Id.* ¶ 23.)

Plaintiff alleges that JPMorgan Chase Bank refused to give him a debit card in his correct name in 2021, as part of a conspiracy with Grant's former landlords. (*Id.* ¶ 55.) He also asserts that between 2001 and 2006, he "was falsely arrested and assaulted" and "falsely charged for assaulting Port Authority Police Officers" after the police falsely identified him as a terrorist. (*Id.* ¶¶ 3, 5.)

In his request for leave to file, Plaintiff asserts that the action is not frivolous and is filed in good faith "because Plaintiff believes that relief can be granted." (Dkt. 2.)

## DISCUSSION

Because Plaintiff's Complaint is almost entirely conclusory, he fails to state a federal cause of action, and therefore fails to assert a good-faith basis for filing the instant Complaint.

**I.     Sovereign Immunity**

Plaintiff names the September 11 Victim Compensation Fund and the World Trade Center Health Program as defendants and alleges that these agencies mishandled his claims and discriminated against him. Both of these programs were established by federal legislation enacted in the aftermath of the September 11, 2001 terrorist attacks and continue to process claims filed by victims, first responders, and others and their personal representatives. *See* Air Transportation Safety and System Stabilization Act of 2001 (the "Air Stabilization Act"), Pub. L. 107–42, 115 Stat. 230, § 403 (September 22, 2001) (establishing the September 11 Victim Compensation Fund); James Zadroga 9/11 Health & Compensation Act of 2010 (the "Zadroga Act"), Pub .L. 111-347 (Jan. 2, 2011) (extending filing dates for the Compensation Fund and establishing the

World Trade Center Health Program); 76 Fed. Reg. 54112 (Aug. 31, 2011) (codified at 28 C.F.R. § 104) (promulgating final rule regarding administration of the Compensation Fund and Health Program); Never Forget the Heroes: James Zadroga, Ray Pfeifer, and Luis Alvarez Permanent Authorization of the September 11th Victim Compensation Fund Act, Pub. L. No. 116-34 (July 29, 2019) (reauthorizing the Zadroga Act and extending filing dates and medical benefits to 2090).

The Air Stabilization Act does not waive sovereign immunity, which precludes suits against the United States and its agencies unless Congress passes a law that specifically takes away immunity in a particular circumstance. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *United States v. Testan*, 424 U.S. 392, 399 (1976) (noting that a waiver of sovereign immunity "cannot be implied but must be unequivocally expressed" (citation omitted)). Thus, Defendants September 11 Victim Compensation Fund and the World Trade Center Health Program are immune from suit, and the Court cannot consider Plaintiff's claims alleging that they failed to provide him compensation or benefits.

## II. Healthcare-Related Claims

The Court does not have jurisdiction over Plaintiff's non-constitutional claims arising from his medical treatments. "Claims for negligence and medical malpractice arise under state law, and a federal court generally will not have original jurisdiction over the claims unless complete diversity exists." *Urena v. Wolfson*, No. 09-CV-1107 (KAM) (LB), 2010 WL 5057208, at *13 (E.D.N.Y. Dec. 6, 2010). Plaintiff has alleged no facts supporting diversity jurisdiction in this matter. Indeed, many of Defendants are located in New York State, as is Plaintiff. Plaintiff's claims related to medical malpractice and record-keeping would thus be dismissed for lack of subject matter jurisdiction.

The Court has also considered whether a claim for First Amendment retaliation against NYCHH[4] lies based on the hospital's failure to treat Grant after she threatened to file a medical malpractice claim. The First Amendment

> prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech. If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim. To prevail on such a claim, a plaintiff must establish a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury.

*Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (alteration, internal quotation marks and citations omitted). However, Plaintiff cannot assert claims on behalf of Grant based on her medical treatment because he has not shown that he has standing to bring claims on her behalf. "In every federal case, the party bringing the suit must establish standing to prosecute the action." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–28 (2014). One requirement for standing, based on "prudential limitations," is "that an individual assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *DiPizio v. Empire State Dev. Corp.*, 745 F. App'x 385, 387 (2d Cir. 2018) (summary order) (citation omitted); *see also Garmon v. County of Rockland*, No. 10-CV-7724 (ALC) (GWG), 2013 WL 541380, at *2 (S.D.N.Y. Feb. 11, 2013) ("Prudential considerations include barring a litigant who is attempting to assert another person's legal rights.").[5] The Federal Rules

---

[4] The Court assumes, without deciding, that employees of NYCHH constitute state actors for the purposes of analyzing Plaintiff's claims, and that Grant's complaint regarding medical malpractice would constitute protected speech.

[5] In addition, to establish that a case or controversy exists so as to confer constitutional standing under Article III, a plaintiff must satisfy three elements: (1) the plaintiff must suffer an "injury in fact," (2) that injury must be "fairly traceable" to the challenged action, and (3) the injury must be likely to be "redressed by a favorable decision" of the federal court. *Nat. Res. Def.*

of Civil Procedure require that an "action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). While Plaintiff might be able to assert claims on Grant's behalf if he were, as alleged, the administrator of her estate, he does not purport to do so here. Therefore, even assuming, *arguendo*, that Grant might have been able to allege a First Amendment retaliation claim against NYCHH for refusing to treat her after she threatened to file a malpractice claim, Plaintiff cannot bring such a claim on his own behalf.

### III.     Housing-Related Claims

Plaintiff also claims that he was discriminated against by the HPD and by private landlords. Specifically, he claims the HPD failed to give him the same information it gave Grant; that it denied his application to join Grant's lease; and that it colluded with the private housing entities he names as they tried to evict him "on false charges that Plaintiff illegally occupied the Apartment, and that Plaintiff owe[d] rent . . . upon the identification of Plaintiff's national origin-Nigeria." (Compl., Dkt. 1, ¶ 58.) The Court has considered whether Plaintiff could bring a claim under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.*, which forbids, among other things, refusing to sell or rent a dwelling or "discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a)–(b). "FHA . . . claims may be prosecuted on the basis of (i) disparate treatment, *i.e.,* that plaintiffs were treated differently because of their membership in a protected class, or on the basis of (ii) disparate impact, *i.e.*, that the defendant's practices have a proportionally greater negative impact on minority populations." *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538,

---

*Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 79 (2d Cir. 2013) ("'[T]he irreducible constitutional minimum of standing' derives from Article III, Section 2 of the U.S. Constitution, which limits federal judicial power to 'cases' and 'controversies.'" (quoting U.S. Const. art. III, § 2; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992))).

574 (E.D.N.Y. 2010) (citing, *inter alia*, *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995)). Here, Plaintiff claims that his national origin was a factor in the HPD property manager's attempts to evict him. He does not, however, allege any details to substantiate this bare, conclusory allegation that the property manager was motivated by discrimination, and therefore he fails to state a claim.[6][7] *See Mitchell v. Project Renewal*, No. 09-CV-1958 (CM), 2010 WL 481348, at *3 (S.D.N.Y. Feb. 1, 2010) (finding that allegations were too conclusory to support race discrimination claim where all plaintiff alleged was that she "believ[ed] because [she] was African American, [her] supervisor felt like [she] wasn't good enough to be a supervisor").[8]

Plaintiff cannot litigate his non-discrimination-related disputes with the landlord over the lease, rent payments or overcharges, and eviction proceedings in this Court because "[f]ederal

---

[6] To the extent Plaintiff attempts to show discrimination by alleging that he and Grant were treated differently when applying for public housing and while in such housing, Plaintiff does not allege any details about Grant's race or national origin, and so does not establish any basis for the Court to infer that they were treated differently on those grounds. (*See generally* Compl., Dkt. 1.) Moreover, the documents attached to the Complaint demonstrate that, as discussed *supra* n.2, Grant already occupied the apartment for which she received HPD assistance; therefore, she and Plaintiff were not similarly situated in seeking benefits from HPD. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146–47 (2d Cir.2011) ("[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true."), *cert. denied*, 568 U.S. 1229 (2013). Indeed, Plaintiff acknowledges that his eviction was based on the landlord's claim that Plaintiff illegally occupied the apartment and owed back rent. (Compl., Dkt. 1, ¶ 58.)

[7] For the same reason, Plaintiff has failed to state a claim for discrimination under 42 U.S.C. § 1982, which provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. To establish a § 1982 claim, a plaintiff must show: (1) that he is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination concerned one or more of the activities enumerated in § 1982. *Nwachukwu v. Liberty Bank*, 257 F. Supp. 3d 280, 305–06 (D. Conn. 2017). Here, Plaintiff has failed to plead non-conclusory facts evincing intent to discriminate.

[8] The Court notes that Plaintiff's repeated invocation of purported anti-Nigerian animus as to several of his claims against different, unrelated parties in the Complaint reinforces the conclusory nature of this assertion.

12

courts do not have subject-matter jurisdiction over landlord-tenant matters." *Rosquist v. St. Marks Realty Assoc., LLC*, No. 08-CV-2764 (NGG), 2008 WL 2965435, at *2 (E.D.N.Y. Aug. 1, 2008) (citing cases); *see also Southerland v. NYCHA*, No. 10-CV-5243 (SLT), 2011 WL 73387, at *2 (E.D.N.Y. Jan. 7, 2011) (dismissing wrongful eviction claim against NYCHA for lack of subject-matter jurisdiction); *Galland v. Margules*, No. 05-CV-5639 (DC), 2005 WL 1981568, at *2 (S.D.N.Y. Aug. 17, 2005) ("[T]his Court does not have federal question subject matter jurisdiction over plaintiff's housing law claims, even when such claims are dressed in the garb of constitutional claims." (citing *Vill. of Millbrook v. Forrest*, 903 F. Supp. 599, 600 (S.D.N.Y. 1995)), *aff'd,* 191 F. App'x 23 (2d Cir. 2006) (summary order).

### IV.     Remaining Claims

The Court has also considered Plaintiff's claims against the financial institutions, insurance company, and retirement plan he names as defendants. Plaintiff alleges that he sought to access Grant's accounts or benefits from these entities and was denied because he could not prove that he was entitled to the funds, and that a bank declined to give him a debit card in the correct name. (Compl., Dkt. 1, ¶¶ 22, 23, 55.) While plaintiffs may bring cases against banks and other financial services providers under 42 U.S.C. §§ 1981 and 1982, both of which protect against non-governmental discrimination, *see Nwachukwu*, 257 F. Supp. 3d at 291, 305–06, Plaintiff has failed to allege any details in support of his conclusory statements that benefits were denied to him based on his national origin. As such, he has failed to state a claim. *See Akyar v. TD Bank US Holding Co.*, No. 18-CV-379 (VSB), 2018 WL 4356734, at *4–5 (S.D.N.Y. Sept. 12, 2018) (dismissing Section 1981 claim alleging race discrimination in banking services where plaintiff made only conclusory allegations of discriminatory animus and disparate treatment); *Mitchell*, 2010 WL 481348, at *3.

To the extent that Plaintiff asserts claims related to his arrest and prosecution related to his interactions with the Port Authority Police Officers between 2001 and 2006, these claims were previously litigated in Plaintiff's prior filings and fall outside of the statute of limitations for civil rights actions. *See Harrison v. New York*, 95 F. Supp. 3d 293, 326 (E.D.N.Y. 2015) ("The statute of limitations for claims brought pursuant to Section 1983 is determined by state law, and in New York State, the statute of limitations for actions brought pursuant to Section 1983 is three years." (citations omitted)). Accordingly, these claims are subject to res judicata and would also be dismissed. *See O'Diah v. U.S. Dep't of Health & Hum. Servs.*, 2016 WL 10567949, at *2 (finding similar claims barred by res judicata). The Court has considered Plaintiff's remaining claims and allegations and finds that no other cause of action lies.

## CONCLUSION

As none of Plaintiff's asserted claims are viable, his motion for leave to file the instant complaint is denied. The January 11, 2012 Order in *O'Diah v. Port Authority of New York and New Jersey*, No. 05-CV-5297 (SJF) (LB), barring Plaintiff from filing future complaints without leave of the Court, remains in effect. Plaintiff is reminded of his continuing obligation to attach a copy of that January 11, 2012 Order to any new submission in this and other courts.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore, *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962). The Clerk of Court is respectfully directed to return Plaintiff's money order to the address he provided, along with a copy of this Order.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 28, 2021
      Brooklyn, New York